# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2016

## STATE OF TENNESSEE v. BRANDON DEPRIEST FULLER, JR.

### Appeal from the Circuit Court for Madison County
### No. 15-351    Donald H. Allen, Judge

### No. W2016-00456-CCA-R3-CD – Filed December 7, 2016

The defendant, Brandon Depriest Fuller, Jr., was convicted of reckless aggravated assault, a Class D felony. The trial court denied his request for judicial diversion and imposed a sentence of three years in the Department of Correction. On appeal, he argues that the trial court erred in denying judicial diversion and imposing a sentence of full confinement. After review, we affirm the judgment of the trial court denying the defendant's request for judicial diversion and imposition of a sentence of confinement.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant Public Defender, for the appellant, Brandon Depriest Fuller, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant was indicted for aggravated assault arising out of an altercation with his mother's then-boyfriend, Tyjuan Snowden, the victim, during which the victim sustained serious injuries.

The victim testified that he was previously engaged to the defendant's mother, Demetria Clark-Love, and considered the defendant to be his stepson. They all lived

together for some time. On March 2, 2015, the victim, Ms. Clark-Love, and the defendant and his three brothers were living on Seaver Road in Madison County. That morning, Ms. Clark-Love woke up the victim and told him that the defendant was upset about something. The victim told her that he would talk to the defendant after she went to work because he and the defendant had "better conversations" when she was not around.

The victim went outside and was talking to the defendant's younger brother who had missed the school bus. The defendant came around from the back of the house and said something like, "'I should have been whupped you.'" The victim was not concerned because he was not scared of the defendant and told the defendant to "chill out." The next thing he remembered was waking up in the Jackson hospital. The victim's mother and Ms. Clark-Love were in the hospital room, but he could not talk due to his injuries. He was transferred to the Regional Medical Center in Memphis, where he stayed for two days.

The victim stated that he suffered "head trauma injuries" and had to undergo oral surgery to have scar tissue removed. His injuries included blurred vision in his left eye, a "busted kneecap," nerve damage on the left side of his body, and a speech impediment. He was undergoing treatment for anxiety. He had become wary of crowds and had trouble sleeping. The pain in his leg was ongoing because of the "screws and pins in it." The numbness in the bottom of his foot caused him to be off-balance. In total, he had knee surgery, oral surgery, and leg surgery. He also had upcoming appointments for MRIs and with his primary care physician. He did not know the total of his medical bills and was still receiving bills at the time of trial. He still suffered pain every day.

The victim recalled that, on three different occasions when he was leaving the house in the days prior to the attack, he saw the defendant standing near the back shed staring at him. He elaborated that the defendant had "this real sinister look like he was building something or making something back there."

The victim did not know what precipitated the attack. He denied hitting or swinging at the defendant that day. One week earlier, he saw the defendant with six cooked sausages in his hand, and he asked the defendant what if his mother wanted some breakfast in the morning but he had eaten all of the sausages. The defendant "snapped" and "threatened to kill [him], promised he was gonna hit [him]." The victim recalled that he and the defendant's mother first got together several years earlier because the defendant had his mother "balled up in the corner about to attack her," and the victim "got [the defendant] under control." The victim had no idea why the defendant assaulted him. The defendant sometimes got upset when the victim told him to clean up the house, but "it was never out of hand."

-2-

The victim recalled that the defendant was twenty or twenty-one years old at the time of trial. When the defendant was eighteen years old, his mother sent him to live with a relative in Texas, but the relative "ended up sending him back." The defendant lived with an aunt and then an uncle upon his return to Tennessee, but neither situation "work[ed] out" and the defendant "ended up coming back home." The defendant had been living with the victim and Ms. Clark-Love for approximately one month before the attack.

The victim denied making fun of the defendant for being "upset" and "crying" after driving in an ice storm a few days before the incident. The victim said that he was sure that the defendant did not hear what he said about the defendant to Ms. Clark-Love because he "did everything appropriately" as the defendant "had already threatened to beat [him] up." The victim said that he was not supposed to start a job the day of the attack because he had failed a drug test and had been told he would not be hired.

Deputy Shane Paar with the Madison County Sheriff's Office testified that he was dispatched to the scene in response to a call "that there was a man down, possible assault having occurred." When he arrived, he saw two African-American men in the carport area of the house. One of the men was "severely hurt," and there was "a substantial amount of blood on and around the subject and in the carport." The victim was unable to speak due to his injuries. The defendant was sitting in an upright position with his legs spread on the ground and the victim's head cradled in his arms. Deputy Paar took a photograph to document the original scene. Deputy Paar did not see anyone else at the house, specifically not a minor child.

Deputy Paar testified that it was obvious that the victim had suffered head and facial trauma. However, there was "too much blood" for him to determine the exact location of the victim's injuries. He did not observe any injuries on the defendant. He attempted to speak to the defendant, but the defendant "was in a state where he was very concerned about [the victim] and was unable to answer questions completely." The only response Deputy Paar was able to get from the defendant was that he was inside the house and did not see or hear anything. After the emergency medical personnel transported the victim to the hospital, Deputy Paar obtained a brief, written statement from the defendant. In his statement, the defendant wrote that he saw two men running away from the scene, and he wanted to chase them, but the victim was bleeding badly.

Lieutenant Felicia Stacy, an investigator with the Madison County Sheriff's Office, testified that the victim had already been transported to the hospital when she arrived on the scene, but the defendant was still at the house. Lieutenant Stacy learned from Captain Fitzgerald and the deputies that spoke with the defendant that the defendant

had informed them that two people had attacked the victim in a possible attempted burglary. Lieutenant Stacy took photographs of the area. There was a large amount of blood on the carport floor and blood spatter on a nearby vehicle, on the bottom of two doors, and on the ceiling of the carport. After looking around, Lieutenant Stacy concluded that the attack occurred only in the carport. Inside the home, Lieutenant Stacy saw a bloody glove and a bloody towel in the living room. Lieutenant Stacy and other officers looked around the scene in an attempt to determine the weapon that caused the victim's injuries. They inspected multiple yard tools, pieces of wood, shovels, and rakes, but none of them appeared to have been used as the weapon.

Lieutenant Stacy did not recall seeing any injuries on the defendant. No other family members or residents of the home were at the location while she was there.

Deputy Terry Stewart with the Madison County Sheriff's Office testified that he received a call from his supervisor concerning the incident and went to the hospital to interview the victim. When he arrived, the victim was in the emergency room, sedated and unconscious on a gurney. Deputy Stewart observed multiple injuries on the victim's head but was not able to see the rest of his body. The victim was unconscious the entire hour that Deputy Stewart was at the hospital. Deputy Stewart took photographs of the victim's head injuries. The victim's girlfriend arrived at the hospital while he was there.

Later that day, Deputy Stewart went to the residence and saw a large amount of blood in the carport. He searched the entire area of the residence but did not find any item that appeared to be the weapon used in the attack.

Sergeant T.J. King with the Madison County Sheriff's Office testified that he participated in the interview of the defendant around 10:20 a.m. the day of the incident, and he also took photographs of the defendant. The defendant had "[l]ots of blood" on his clothing and boots, "signs of a fight on his knuckles," and was "visibly upset." At the time, Sergeant King was not aware that the victim had been lying on the defendant's legs when officers arrived at the scene. Prior to talking to the defendant, deputies told Sergeant King that the defendant had said two people had attacked the victim. However, in his statement to Sergeant King, the defendant told a completely different story.

The defendant told Sergeant King that the victim wanted to use his cell phone, "had an attitude, and demanded the phone before 9 a.m." The defendant and the victim began to argue about something that had happened on a prior day when the victim laughed at the defendant "regarding an accident." The defendant also said that the victim wanted to use the defendant's urine for a drug test because the victim was supposed to start a new job that day.

The defendant stated that he and the victim went to the carport where they continued to argue, and the victim swung at the defendant but missed. The defendant "remembered getting the victim on the ground, punch[ing] the victim repeatedly, in which the [defendant] described as ground and pound" for approximately fifteen seconds. Sergeant King explained that "[g]round and pound" is a term used in mixed martial arts for when "you get somebody on the ground [and] you just pound their head." The defendant said that, as he got up, the victim grabbed his leg so he "kicked [the victim] in the face with [his] right foot." The defendant was wearing steel-toed boots at the time of the assault, and he admitted that he had "mixed martial arts training in the past." The defendant told Sergeant King that the victim was a "Shotgun Crip," but the defendant denied any gang affiliation. Sergeant King could not recall if the defendant told him that the victim had been "dry snitching" on him, and Sergeant King did not know what that meant.

The day after the incident, Sergeant King went to the hospital to see the victim and observed that he had several facial injuries and that his face was "very swollen." The victim was able to talk, but "he was muffled" and "unable to tell [Sergeant King] much of anything." Shortly after Sergeant King arrived, the victim was transported to the Regional Medical Center in Memphis.

Demetria Clark-Love, the defendant's mother, testified on behalf of the defendant. Mrs. Clark-Love said that, prior to the incident, she and the victim had dated for three years and had lived together most of that time. At the time of trial, she and the victim were no longer dating. She said she had three other sons in addition to the defendant, ranging in age from twelve to sixteen.

Ms. Clark-Love denied that the defendant had ever threatened her physically. He moved to Texas for a period of time in order to attend college. He had to live there for six months before he could be considered a resident, so he lived with his aunt. He stayed for approximately three months before returning to Tennessee because "it just wasn't working out." The defendant lived with other relatives, but he ultimately returned to live with his mother because of transportation issues and financial problems.

Ms. Clark-Love stated that, one or two weeks before the incident, the defendant was driving and slid on a patch of ice. The defendant was "hysterical" about having almost gotten into a wreck, and he walked home "crying" and "very emotional about it." The victim "[f]ound it hilarious" and laughed about it.

Ms. Clark-Love recalled that the day before the incident, the victim returned from church with one of his friends. The victim was talking about all that had gone on at church when "all of a sudden, he said . . .[,] 'Well, you must think I'm afraid of your

son.'"  The defendant was home at the time, and the victim said it loudly enough for the defendant to hear it.  The victim and Ms. Clark-Love went for a drive, and she asked the victim not to talk about her children when they were in the house but to instead pull her aside if he had something to say.  Before the victim and Ms. Clark-Love left for the drive, the defendant told Ms. Clark-Love that he wanted to move out "because he didn't want no . . . trouble."

On the day of the incident, Ms. Clark-Love went to work at 8:30 a.m.  The victim and the defendant were at the house, but the other boys had gone to school.  The defendant was sleeping on the couch, and Ms. Clark-Love woke him up to ask him for the keys to the truck.  Ms. Clark-Love got the keys because she knew the victim was going to a job interview and drug screen.

Sometime after Ms. Clark-Love arrived at work, she received a phone call from the defendant.  The defendant told her that the victim had been attacked by two strangers.  He said that he was coming out of the bathroom and saw "two strange people running off."  The defendant told her that he had called the police and for an ambulance and that both were already there.  Ms. Clark-Love went to the hospital and observed the injuries to the victim's face.  The next day, Ms. Clark-Love learned that the defendant's story was not true when she called the police department and heard that he was being held as a suspect.

The defendant testified that, during the course of his mother's and the victim's relationship, he and the victim got along "[p]retty often" but had "lots of disagreements."  However, nothing physical occurred between them prior to March 2, 2015.  The defendant recalled that the victim harassed the defendant's brothers at times, and he would intercede.  When the victim told the defendant's brothers to do something and they did not listen, the victim "put his hands on them" or "cussed them out."  The victim's actions upset the defendant.  The defendant moved to Texas to live with his aunt and uncle because he and the victim were not getting along.  However, he did not stay there long because he did not get along with his aunt and uncle.

The defendant recalled that the victim did things to provoke him.  For example, two weeks before the incident in this case, he almost had a car accident on an icy road and was "real emotional" thinking that he "could have lost [his] life," and the victim laughed at him because he thought it was "hilarious."  Then, a day or two before the incident in this case, the defendant overheard the victim tell Ms. Clark-Love that he had laughed at the defendant because the defendant had disrespected him.  The defendant did not know what the victim was talking about.  However, after hearing that, the defendant told his mother that the defendant needed to move out.

The defendant testified that, on March 2, 2015, his mother woke him up asking for the truck keys. He gave her the keys, straightened up the room, and then began making calls in an attempt to find a job. The victim came in and said that he needed to use the phone to find out if he needed to report to work. The defendant told the victim that he was using the phone and went outside. The victim followed him and "shot off about the situation, what happened about the car wreck situation . . . that h[e] and my mother w[ere] talking about something totally different or whatever. Basically, he was just . . . telling me a lie." The defendant said that he "was just trying to squash everything" because he knew the victim was lying, but then he said to the victim, "Well, what you done was a bitch move." After that, the victim "shot off" and "snapped."

The defendant admitted that he had taken martial arts lessons for a period of eight years, starting at the age of eleven. He said that the martial arts that he studied were for self-defense. The defendant recalled that long before his altercation with the victim, the victim told him that he was a former boxer. The defendant thought the victim was trying to scare him.

The defendant said that he already had on his steel-toed boots before he went outside. The defendant admitted that he put on the glove that was later found at the scene when he was "preparing" himself for the victim to swing at him. He said that he already had the glove in his back pocket and that it was a work glove, not a boxing glove.

When the victim "snapped," the two "had it out" and started fighting. The victim swung at the defendant, but the defendant ducked "and took him down." The defendant weighed approximately 170 pounds at the time, and the victim weighed about 240 pounds. The defendant said that, when the victim swung at him, he was afraid that the victim was going to beat him up. When the defendant took the victim down, he "ground[ed] and pound[ed]" the victim. He believed he hit the victim six times in fifteen seconds. The defendant denied knocking the victim out with the first punch. The defendant acknowledged that the victim never struck him during the fight.

The defendant testified that, when he got off the victim, the victim grabbed his leg like he was trying to get up, so he kicked the victim in the face. The fight ended at that point. The defendant went inside to calm down, but he saw the victim through the window asking him for help. The defendant helped the victim "just to show the kindness" of his heart and to "show mercy." The defendant called 911.

The defendant acknowledged that he initially lied to the police about two strangers attacking the victim, explaining that he was "paranoid" and "scared" and "wishing that . . . all this never happe[ne]d." The defendant said that he followed the 911 operator's instructions and "basically tried to take care of [the victim]." He held the victim's head

in his lap until the emergency medical personnel arrived. He knew that the victim was seriously injured, and he "really just felt bad like [he] wish[ed] [it] never happened." When he went to the police station, he told the officers what had really happened.

The defendant denied coming from behind the house and jumping on the victim or standing behind a shed and glaring at the victim. The defendant said that on the morning of the incident, the victim asked to use the defendant's urine for a drug screen at work, and the defendant told him no. The defendant denied hitting the victim in the knee, explaining that the victim's knee injury occurred when the victim fell while with emergency personnel.

Following the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of reckless aggravated assault. Thereafter, the trial court conducted a sentencing hearing at which the victim recounted his injuries for the court and said that he had incurred medical bills thus far totaling $12,000 due to the defendant's attack. The defendant relied on the certification showing that he qualified for judicial diversion and asked the court to recall his and his mother's trial testimony. After considering the defendant's application for judicial diversion, the presentence report, the evidence presented at trial and the sentencing hearing, as well as the principles of sentencing, the trial court denied the defendant's request for judicial diversion and imposed a sentence of three years in confinement. The defendant appealed.

## ANALYSIS

On appeal, the defendant argues that the trial court erred in denying his request for judicial diversion and in imposing a sentence of confinement.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought, is not seeking deferral of further proceedings for a sexual offense, a violation of section 71-6-117 or section 71-6-119, or a Class A or Class B felony, and who has not been previously convicted of a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

Mere eligibility does not entitle a defendant to judicial diversion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Instead, the decision to grant or deny a

qualified defendant judicial diversion "is entrusted to the trial court." State v. King, 432 S.W.3d 316, 326 (Tenn. 2014) (citation omitted)  In determining whether to grant diversion, the trial court is to consider the following factors:  (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused.  State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

A trial court's decision regarding the grant or denial of judicial diversion is reviewed under the State v. Bise, 380 S.W.3d 682 (Tenn. 2012), presumption of reasonableness standard so long as there is evidence the trial court considered and identified the relevant Electroplating factors in rendering its decision:

> Under the Bise standard of review, when a trial court considers the Parker and Electroplating factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision.  Although the trial court is not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it.  Thereafter, the trial court may proceed to solely address the relevant factors.

King, 432 S.W.3d at 327 (footnote omitted).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing.  State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)).  Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary."  Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less.  Id. § 40-35-303(a).  A defendant is not, however, automatically entitled to probation as a matter of law.  The burden is upon the defendant to show that he is a suitable candidate for probation.  Id. § 40-35-

303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

In determining the defendant's sentence, the trial court first noted that the defendant had no prior criminal record and had passed drug tests, including one given during the sentencing hearing. The court found that the criminal conduct in the case was a "very, very serious matter" because it involved an aggravated assault that caused serious bodily injury to the victim. The court considered the defendant's testimony that he acted in self-defense. It noted that the jury's finding the defendant guilty of aggravated assault by reckless conduct implied that the jury rejected the defendant's claim of self-defense. The court next considered the defendant's potential for rehabilitation and treatment. The court noted that the defendant had no prior felony

record and would be considered a Range I offender subject to a sentence of two to four years.

The trial court stated that it had considered the question of judicial diversion "very carefully." The court reviewed the facts of the case and the exhibits introduced at trial, especially the photographs that showed "the numerous injuries that the victim suffered." The court recalled the victim's testimony at trial and the sentencing hearing about his injuries. The court also noted that the victim testified that the defendant threatened to kill him two weeks prior to the attack. For those reasons, the court found the facts and circumstances of the offense to be "a serious matter" and that they weighed "heavily against the granting of diversion in this case."

The trial court considered whether the defendant was amenable to correction. In doing so, the court again acknowledged that the defendant had no prior criminal record and noted his age – 20 at the time of the offense and 21 at the time of sentencing. The court concluded that the factors relative to the defendant's amenability to correction weighed in favor of diversion.

The trial court found that the defendant's social history and mental health weighed against granting diversion. The court stated that it was "very, very, very obvious" that the defendant "has some severe anger problems." It noted that the defendant "acted with anger" toward the victim, taking his aggression out on the victim and causing serious injuries, for no other reason than he was mad at the victim "apparently because the victim may have made fun of him a couple of weeks prior to [the assault]."

The trial court considered the deterrent effect and found that it weighed against granting diversion "for this [d]efendant." The court also found that granting diversion in this case would not serve the interests of justice both for the defendant and the public "because of the nature and the extent of the injuries that [the defendant] caused to [the victim]."

The trial court then turned to the enhancement factors in the case and determined that the defendant treated the victim with exceptional cruelty during the assault. The trial court recalled that the defendant approached the victim "unprovoked" and committed the aggravated assault. The court noted that the victim remembered waking up in the hospital in "tremendous pain" and that he suffered some serious and permanent injuries. The court gave that factor "great weight."

The trial court implicitly accredited the victim's testimony that the defendant previously had threatened to kill him and threatened to beat him up one to two weeks before the aggravated assault. The court recalled that the defendant overheard a

conversation between the victim and the defendant's mother and felt that the victim was making fun of him for crying. The court concluded that the defendant "waited until the opportunity to get some type of revenge against [the victim]."

The trial court considered the facts and testimony and found that the defendant "was not honest about anything." It recalled that, when the officers arrived at the scene, the defendant told them that two strangers had assaulted the victim and gave a written statement to that effect. The court concluded that his statement was "totally fabricated." The court considered the defendant's second version of events in which he claimed that the victim attacked him and he acted in self-defense. The court noted that the "proof doesn't show that by any means," questioning why the defendant "would . . . go and put on a glove" if he acted in self-defense. The court determined that the defendant "was totally unprovoked in this attack." For those reasons, the court concluded that the defendant "ha[d] not been very truthful or honest to any extent." The court observed that the jury did not believe the defendant's assertion that he acted in self-defense, recalling the defendant's testimony that "he had grounded and pounded the victim's head . . . [w]hile [the victim] laid there on the concrete, this [d]efendant was grounding and pounding for about 15 seconds the victim's head."

The trial court also recalled the fact that the defendant was wearing steel-toed boots when he kicked the victim "numerous times after he attacked him and knocked him to the ground." The court observed that the boots could be considered a deadly weapon in that they were used to kick someone in the face and head area. The court opined that the defendant may have also kicked the victim in the kneecap, given that the victim's kneecap was broken.

The trial court revisited the defendant's claim of self-defense and that the defendant's only allegation was that the victim swung at him but did not hit him. Despite the fact that he was not hit, the defendant "committed this serious assault." The court recalled that the defendant testified, "At some point, I helped him up so that I could show him some mercy." The court questioned how that made any sense if the defendant acted in self-defense.

The trial court considered the mitigating factors but found that none applied. It noted that the defendant had not expressed any remorse for his actions. The court considered the defendant's age but determined "he's old enough to know that you don't commit such an egregious assault against anyone for any reason."

The trial court noted that in determining the defendant's sentence, it considered the presentence report, the defendant's physical and mental condition, his social history, the facts and circumstances of the offense, and the defendant's previous actions and

character. It concluded that the appropriate sentence was a mid-range sentence of three years. In considering whether the defendant was a good candidate for alternative sentencing, the court found that the defendant's "untruthfulness at trial" and "his clear anger issues" weighed against an alternative sentence. The court noted that the defendant had moved away from home for a period of time and that "there had to be some issues involved why he would leave Jackson." The court concluded that a sentence of probation "would unduly depreciate the seriousness of this offense." The court summarized, "I can't emphasize enough that he's not been truthful before the jury. He's not been truthful before the Court. He's expressed no remorse for the injuries and the pain and the suffering that he's caused to [the victim]." Accordingly, the court determined that it would be "appropriate" for the defendant to serve his sentence in confinement.

The record reveals that the trial court properly exercised its discretion in its consideration and weighing of the Parker and Electroplating factors in reaching its decision to deny the defendant's request for judicial diversion. It considered the defendant's amenability to correction and found that that factor weighed in favor of diversion. The court considered that the defendant had no criminal record, which weighed in favor of diversion.

On the negative side, however, the trial court determined that the circumstances of the offense weighed "heavily against the granting of diversion in this case." The court concluded that the defendant's social history weighed against granting diversion, apparently from the issues surrounding his living with relatives in Texas for a period of time. The court determined that the defendant's mental health weighed against diversion, noting that it was "very, very, very obvious" that the defendant "ha[d] some severe anger problems," and how he lashed out at the victim "apparently because the victim may have made fun of him a couple of weeks prior to [the assault]." The defendant asserts that no "mental health professional testified that [the defendant] was mentally ill." However, the court's conclusion was based on the testimony and the court's viewing of the defendant's demeanor, and not on a finding that the defendant was mentally ill. The court also considered and determined that the deterrence value and the ends of justice for the public as well as the defendant weighed against diversion.

The defendant argues that the trial court did not "fully articulate reasons in favor of or against each of the Electroplating factors." Regardless of whether the trial court provided explicit reasoning for each and every factor, the record shows that the court considered each factor and concluded that the factors against diversion outweighed the factors in favor of diversion, as was a proper exercise of the court's discretion and entitled to a presumption of reasonableness.

In addition, the trial court properly exercised its discretion in imposing a sentence of confinement. The court based the denial of an alternative sentence on the defendant's lack of honesty, "clear anger issues," and lack of remorse. The court reiterated the circumstances of the offense that the defendant, acting unprovoked, caused the victim serious and permanent injuries by "grounding and pounding" him and kicking him in the face while wearing steel-toed boots. The court concluded that a sentence of probation "would unduly depreciate the seriousness of this offense." The court considered all of the factors to be used when determining whether to impose a sentence of confinement and put its findings on the record. The record supports the trial court's determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court denying the defendant's request for judicial diversion and imposition of a sentence of confinement.

_____
ALAN E. GLENN, JUDGE

-14-